Birdsboro Corporation, Petitioner *v.* Pennsylvania Public Utility Commission and UGI Corporation, Respondents.

482

Argued May 9, 1979, before President Judge Bow-MAN and Judges CRUMLISH, JR., MENCER, BLATT, DI-SALLE, CRAIG and MACPHAIL. Judges WILKINSON, JR. and ROGERS did not participate.

*Stephen A. George,* with him *Buchanan, Ingersoll, Rodewald, Kyle & Buerger,* for petitioner.

*Louise A. Russell,* Assistant Counsel, with her *Shirley Rae Don,* Deputy Chief Counsel, and *George M. Kashi,* Chief Counsel, for respondent, Pennsylvania Public Utility Commission.

*Kenneth R. Myers,* with him *Morgan, Lewis & Bockius,* for respondent, UGI Corporation.

OPINION BY JUDGE DISALLE, October 16, 1979:

In this appeal Birdsboro Corporation (Petitioner) seeks review of a decision by the Pennsylvania Public Utility Commission (Commission) dismissing Petitioner's complaint against UGI Corporation (UGI), the other Respondent, which alleged that the minimum annual bill provision in Rate LF under

UGI's gas tariff was unjust and unreasonable, and, under the circumstances of this case, a violation of Section 301 of the Public Utility Law.[1] We affirm.

Petitioner is a manufacturing concern located in Birdsboro, Pennsylvania. Its principal products are specialty steel castings and machinery used in the energy, defense and steel industries. UGI is a public utility serving gas supplied by Columbia Gas Transmission Corporation to customers in thirteen counties in eastern Pennsylvania. From 1965 until June 4, 1974, UGI offered a special promotional rate, contained in Tariff Gas—Pa. P.U.C. No. 3, for customers having a high usage and a high load factor (Rate LF). Under Rate LF each customer agreed to a Daily Contract Requirement (DCR) not lower than 100 mcf[2] of gas. Every month the customer contracted to pay a demand charge plus a flat charge for all gas taken. At the end of each billing year the customer was obligated to pay a minimum amount equal to a 65% load factor (65% of the DCR multiplied by the number of billing days in the year). This arrangement benefits the utility because it requires less investment in facilities and less operating expenses. In return, the customer is charged less under Rate LF than under Rate N.[3] Rate N does not require a high load factor and was available to Petitioner. The 65% load factor in Rate LF thus permitted UGI to identify and offer economical service to customers having a high load factor without discriminating against Rate N customers.

Since 1971, Petitioner had contracted under Rate LF for a 1,000 mcf DCR or 365,000 mcf each year. It

---

[1] Section 301 of the Public Utility Law, Act of May 28, 1937, P.L. 1053, *as amended, formerly* 66 P.S. §1141, repealed by Section 2 of the Act of July 1, 1978, P.L. 598, 66 Pa. C.S.A. Reps. A similar provision is now contained in the Public Utility Code, 66 Pa. C.S. §1301.

[2] 1,000 cubic feet of gas = 1 mcf.

[3] Rate N is a general service non-residential rate.

therefore was obligated to pay for 237,250 mcfs (65% of 365,000) annually, irrespective of the amount of gas actually used. Petitioner alleges that a company curtailment of the gas supply during the 3 month period of its highest needs in 1975-76 prevented it from using its 65% minimum load factor. Therefore, the minimum bill, argues Petitioner, is an unjust and unreasonable penalty for compliance with the curtailment plan and is thus a violation of Section 301 of the Public Utility Law. Petitioner seeks an order precluding UGI from collecting the difference between charges for the gas actually used in that billing year (174,632 mcf) and the contractual minimum amount (237,250 mcf), which difference amounts to $56,902.97.

Initially, we note that Petitioner does not challenge Rate LF as unjust and unreasonable per se, but rather only as it applies under the special circumstances of this case. Compared to the LF class as a whole, Petitioner was both a marginal user and a seasonal user. The LF class as a whole had a load factor of approximately 89%, and its consumption of natural gas was fairly uniform on a month to month basis. Petitioner's average load factor was below 65% until the contract year 1974-75 (when it was 66.16%), and its average for the three years then ending was only 64.35%. Also, peak consumption by Petitioner occurred during the five month winter period because of primary usage for space heating and not for industrial processes throughout the year. Despite these differences from the class of customers for whom the rate was designed, Petitioner knowingly chose to remain in this rate because it found gas to be cheapest at Rate LF even when it did not use its annual 65% minimum.

In a series of letters beginning on July 2, 1975, UGI warned Petitioner that curtailments in the gas supply were expected for winter 1975, and such curtailments did in fact become effective November 1,

1975. Petitioner responded by reducing gas consumption, converting some facilities to oil and applying for propane from the Federal Energy Administration. The record shows that UGI notified Petitioner in November and December of 1975 that its reduced consumption meant the minimum annual bill would be substantial. UGI suggested either a changeover to Rate N or a lowered DCR. We note that in 1971, Petitioner had agreed to reduce its DCR from 1200 to 1000 mcf.

Officers of Birdsboro nevertheless decided to maintain its 1000 mcf DCR because they hoped to be awarded a large contract for tank hulls from Chrysler Corporation and the United States Army. They thus chose to keep Petitioner's gas supply possibilities greater than its needs, while simultaneously trying to buy fuel at the cheapest rate possible. The Commission found that this conscious business judgment, made with full knowledge of the consequences, resulted in the large discrepancy between the minimum annual bill and the amount of gas used. Furthermore, testimony showed that the actual cost of gas for the year, even with the minimum bill, was the lowest possible under UGI's tariff during this period and was also lower than the cost of comparable alternative fuels at that time.[4] Consequently, Petitioner's contention that the minimum annual bill provision of Rate LF is a wrongful penalty against it for instituting conservation measures was not borne out by the evidence.[5]

---

[4] The cost of gas for the contract year 1975-76 at the minimum charge billed to Petitioner was $2.37 per million BTU's. The cost of two alternative fuels would have been $3.60 for propane and $2.40 for No. 2 oil per million BTU's respectively.

[5] In view of our disposition of this matter, we need not reach the issue of whether the Commission erred as a matter of law in concluding that, because Petitioner had not shown Rate LF to be

486

Based upon the foregoing and our own independent review of the record here, we cannot conclude that the Commission's findings and conclusions were not supported by substantial evidence. Clearly the Petitioner has not established that the Commission's refusal to relieve it of its contractual obligations with UGI, under the peculiar circumstances of this case, was improper. Accordingly, we affirm the decision of the Commission dismissing Petitioner's complaint.

ORDER

AND Now, this 16th day of October, 1979, the order of the Pennsylvania Public Utility Commission, entered May 9, 1978, at Docket No. C 22016 is hereby affirmed.

---

unjust and unreasonable as to the entire class of Rate LF customers, the Commission lacked the power to grant individual relief to Petitioner.